J-S20031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: W.O., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 31 EDA 2023 |

Appeal from the Order Entered December 6, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001575-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: W.A.O., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 32 EDA 2023 |

Appeal from the Decree Entered December 6, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000129-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: W.O., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 33 EDA 2023 |

Appeal from the Order Entered December 6, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001576-2019

| IN THE INTEREST OF: W.O., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 34 EDA 2023 |

Appeal from the Decree Entered December 6, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000128-2021

| IN THE INTEREST OF: X.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 35 EDA 2023 |

Appeal from the Order Entered December 6, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001577-2019

| IN THE INTEREST OF: X.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 36 EDA 2023 |

Appeal from the Decree Entered December 6, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000130-2021

BEFORE: DUBOW, J., KUNSELMAN, J., and COLINS, J.*

MEMORANDUM BY COLINS, J.:                                    **FILED JULY 31, 2023**

W.R. ("Father") appeals from the December 6, 2022 decrees that terminated his parental rights with respect to his biological sons, W.A.O., born in October 2012, W.O., born in August 2014, and X.R., born in September 2019 (collectively, "the Children").[1, 2]  Father has also appealed the December 6, 2022 orders that changed the respective permanency goals of the Children from reunification to adoption.  After careful review, we affirm the termination decrees and dismiss Father's appeals from the goal change orders as moot.

The trial court has authored an apt summary of the lengthy factual and procedural history of this matter, as follows:

> [In October 2012], the Philadelphia Department of Human Services ("DHS") received a General Protective Services ("GPS") report which alleged that [J.O. ("Mother")] was suffering from uncontrollable depression which resulted in her using cocaine and marijuana [during her pregnancy and] that she had been diagnosed with depression and bipolar disorder.  The report also alleged that W.A.O. was born full term [in October 2012], and that W.A.O. and Mother were expected to be discharged from the

---

\* Retired Senior Judge assigned to the Superior Court.

[1]  The trial court's December 6, 2022 decrees also terminated the parental rights of the Children's mother, J.O., who did not file any notice of appeal with respect to these decrees, nor has she otherwise participated in this appeal.

[2]  Although Father is listed on X.R.'s birth certificate, he does not appear on the birth certificates of either W.A.O. or W.O.  **See** N.T., 12/6/22, at 35-36. However, he has consistently held himself out as the biological father of the Children throughout these proceedings.  **Id**.  Accordingly, the trial court's decrees also terminated the parental rights of any putative, unknown fathers. No other individual has ever sought to exercise such rights in this case.

hospital on October 18, 2012. Mother claimed not to know the identity of W.A.O.'s father.

On October 17, 2012, W.A.O. was released from the hospital into Mother's care. . . .

[In August 2014], Mother gave birth to W.O. at Temple University Hospital. . . . He was hospitalized in the neonatal intensive care unit due to being born prematurely.

Mother was also the guardian of two other older biological children at this time and those two children, as well as well as W.A.O. and W.O., resided with her. . . .

On May 2, 2019, DHS received a GPS report alleging that one of the older children brought a vial of crack cocaine to school and showed it to a classmate. [When questioned by school staff, the older child averred that the vial of cocaine had been in a purse she received from Mother.]

        . . . .

[In late September 2019], DHS received a GPS report alleging that one day earlier, Mother and X.R. both tested positive for cocaine at the time of X.R.'s birth . . . .

The same day, DHS visited the home of X.R.'s paternal uncle where he, Mother, the Children, and the two older children were present. DHS learned that Father also resided at the home but was not present at the time of their first visit. . . . DHS developed a single case plan ("SCP") . . .

On September 25, 2019, X.R. was discharged from the hospital into the care of Mother and Father (collectively, "Parents"). The Children remained in Mother's and Father's care. . . .

DHS noticed that W.O. was not meeting developmental milestones and did not behave in an age-appropriate manner.

The Children were adjudicated dependent by the court on October 16, 2019. It was ordered that Mother be referred for monitoring, a forthwith drug screen, and three random drug screens prior to the next court listing . . . . Parents were both ordered to sign releases and consents. Father was ordered to avail himself to [the

- 4 -

Community Umbrella Agency ("CUA")] for an interview, schedule an appointment with CUA, and be incorporated into the written safety plan. The court also ordered Father to provide verification of his employment. . . .

On November 20, 2019, CUA received Mother's drug screen results from October 16, 2019, and October 25, 2019. Both tests were positive for illegal substances. On November 21, 2019, DHS obtained an order of protective custody ("OPC") for the Children and placed them in foster care[.] Father remained in the family residence with Mother and the two older children. At the shelter care hearing held on November 22, 2019, the court . . . committed the Children to CUA. . . .

On December 14, 2020, CUA revised the single case plan ("SCP") for this case. . . .

The SCP objectives identified for Father were to contact the resource parent to be engaged in medical appointments, to contact the school to be engaged in educational planning, to attend parenting classes on a weekly basis, to complete parenting classes and receive a certification of completion, to participate in visitations with the Children weekly or as scheduled, to demonstrate emotional and physical support towards the Children during contact with them, to complete housing applications and to attend a housing program. Father signed the document identifying these objectives.

A permanency review hearing was held for the Children before the court on March 16, 2020. It was ordered that the Children remain as committed and that Parents receive twice weekly supervised visits with the Children at the provider agency. . . .

Another permanency review hearing for the Children was held before the court on November 10, 2020. It was ordered that Parents be referred for dual diagnosis assessments (mental health and substance abuse) . . ., that CUA conduct a home assessment of the family home, that Parents comply with the home assessment, . . . and that Parents be referred for parenting classes. The court found that Parents had secured new housing, but that CUA had been unable to assess the home. The court also found that neither Mother nor Father had demonstrated any compliance with the permanency plan.

On October 22, 2021, DHS filed separate petitions to terminate Mother's and Father's parental rights as to the Children . . . . [Contemporaneously, DHS also filed petitions to change the Childrens' respective permanency goals.].

Trial Court Opinion, 3/17/23, at 2-11 (cleaned up).

On December 6, 2022, the court held a combined hearing on the respective termination and goal change petitions. Father failed to appear for the hearing but was represented by counsel for the entirety of the hearing. The Children appeared at the beginning of the hearing to briefly meet with the trial court, but they were released prior to the hearing. The Children were also properly represented by court-appointed, legal interest counsel, who advocated for the Children during these proceedings.[3] **See** 23 Pa.C.S. § 2313(a); **see also In re K.M.G**., 240 A.3d 1218, 1235 (Pa. 2020) (holding that "appellate courts should engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with Subsection 2313(a)."). At the hearing, DHS adduced testimony from CUA case manager supervisor Amber Williams and social worker Roya Paller. The same day, the trial court entered decrees that involuntarily terminated the parental rights of Mother and Father with respect to the Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and 2511(b). The trial court also filed permanency

---

[3] Separately, a guardian *ad litem* ("GAL") was appointed to represent the Children's best interests. The GAL has filed a brief in this matter advocating in favor of, *inter alia*, affirming the trial court's termination decrees.

review orders that changed the Children's respective permanency goals from reunification to adoption.

On January 3, 2022, Father filed separate, timely notices of appeal at each of the above-captioned dockets, wherein he challenged both the trial court's termination decrees and goal change orders as to W.A.O., W.O., and X.R. Contemporaneously, Father also submitted timely concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court responded with a responsive opinion pursuant to Rule 1925(a)(2)(ii), which collectively addressed Father's dual assertions of error. Finally, this Court has *sua sponte* consolidated the above-captioned cases.

In pertinent part, Father has raised three colorable claims for our consideration, namely that the trial court erred by: (1) finding a sufficient basis to terminate Father's parental rights pursuant to Section 2511(a)(2); (2) concluding that termination was proper pursuant to Section 2511(b); and (3) changing the Children's permanency goals from reunification to adoption.[4] *See* Father's Brief at 5-6. We will begin by addressing the first two claims, which concern termination of parental rights.

Our standard of review in this context is well-settled:

---

[4] We acknowledge that the statement of questions in Father's brief purports to challenge each of the trial court's holdings pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8). *See* Father's Brief at 5-6. However, as discussed further *infra*, this Court need only agree with the trial court's findings pursuant to one of these subsections in order to affirm.

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed by statute at 23 Pa.C.S. § 2511 of the Adoption Act, which necessitates a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination pursuant to Section 2511(a)(1)-(11). *M.E.*, 283 A.3d at 830. If the orphans' court determines that a petitioner has established

grounds for termination under at least one of these subsections by "clear and convincing evidence," the court then assesses the petition under Section 2511(b), which focuses primarily upon the child's developmental, physical, and emotional needs and welfare. **Id**. at 830 (citing **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013)); **see also** 23 Pa.C.S. § 2511(b).

This Court "need only agree with any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." **T.S.M.**, 71 A.3d at 267 (citing **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*)). Our analysis in this proceeding implicates Section 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(a)(2), (b).

In order to satisfy section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Grounds for termination pursuant to section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id*. (citing *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010)). On this point, we emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id*.

Once a petitioner establishes adequate grounds for termination pursuant to Section 2511(a), the court turns to Section 2511(b), which requires it to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, ___ A.3d ___, 2023 WL 4092986 at *13 (Pa. June 21, 2023). This determination "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id*. at *14. Accordingly,

as our Supreme Court has recently explained, there is no "exhaustive list" of factors that must be considered in this context. *Id*. at *18 n.28.

Nonetheless, beginning with *In re E.M.*, 620 A.2d 481 (Pa. 1993), our Supreme Court has consistently mandated that any Section 2511(b) analysis "requires consideration of the emotional bonds between the parent and child." *T.S.M.*, 71 A.3d at 267. Specifically, "[c]ourts must determine whether the trauma caused by breaking [the parent-child] bond is outweighed by the benefit of moving the child toward a permanent home." *Id*. at 253 (cleaned up). The recognized threshold for this required bond inquiry is whether termination will sever a "necessary and beneficial relationship," such that the child "could suffer extreme emotional consequences." *K.T.*, 2023 WL 4092986, *16. Our Supreme Court has emphasized that a court "must consider more than proof of an adverse or detrimental impact from severance of the parental bond." *Id*. at *18.

However, as noted above, our case law concomitantly reflects that a court's analysis pursuant to Section 2511(b) is not narrow but must include consideration of "intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267. We note that "the parental bond is but one part of the overall subsection (b) analysis." *K.T.*, 2023 WL 4092986, *18; *see also In re N.A.M.*, 33 A.3.d 95, 103 (Pa. Super. 2011). Thus, "courts must not only consider the child's bond with the biological parent, but also examine the intangibles such as the love, comfort, security, and stability the child might

- 11 -

have with the **foster** parent." **K.T.**, 2023 WL 4092986, *17 (emphasis in original; internal citations and quotation marks omitted). In conformity with this instruction, our Supreme Court has noted that Pennsylvania courts should also consider where appropriate: (1) the child's need for permanency and length of time in foster care; (2) whether the child is in a pre-adoptive home and bonded with foster parents; and (3) whether the foster home meets the child's developmental, physical, and emotional needs. **Id**. at *18.

Father's first claim for relief challenges the trial court's finding pursuant to Section 2511(a)(2) that termination of his parental rights was appropriate. Specifically, Father avers that the trial court failed to give adequate credit to him for taking steps to "remedy his situation by completing the objective of parenting and maintaining his residence." Father's Brief at 22. Thus, Father contends that completion of a parenting class and maintenance of a livable household should be sufficient to preclude termination. We disagree.

The trial court's relevant findings with respect to Father are succinct:

Father's objectives were to ensure that the Children's educational and medical needs were being met, to ensure that any mental health or behavioral needs were being met, to comply with the court orders including those concerning visitation, and to attend parenting class. . . .

[Father] has never attended any of the Children's medical appointments since they went into care over [two] years ago. He has never contacted the [Children's] schools to check on their progress since the Children went into care. He has made no effort to be involved in the [Children's] educational planning. [Father was referred] to a parent mentor because of his lack of engagement with the Children and because of his complete reliance on Mother to attempt to meet the Children's needs.

- 12 -

Father failed to attend the program because he stated it conflicted with his employment.

. . . .

Father did not attend the hearing at which his parental rights were terminated despite knowing the gravity of the consequences that could, and did, occur. His attorney represented to the [c]ourt that he could not attend because of his work schedule. This is the same excuse that he used for failing to attend the parent mentor program . . . . [Overall,] Father seemed unconcerned with meeting the objectives of his SCP and demonstrated an apathetic attitude towards achieving reunification with the Children.

Trial Court Opinion, 3/17/23, at 14-16.

These findings are largely predicated upon the testimony of Ms. Williams, the representative of the CUA that was responsible for many of the services and referrals offered to Father in this matter. *See* N.T., 12/6/22, at 21-72. In particular, Ms. Williams confirmed that Father's SCP goals included: (1) ensuring that the Children's educational goals are met; (2) attending to the Children's medical needs; and (3) actively participating in visitations with the Children; and (4) completing parenting classes. *See id*. at 42. Of these goals, Ms. Williams testified that Father succeeded only in completing a recommended parental class over the three years that the Children were in placement. *Id*. at 46-47. Furthermore, while we gather that Father participated in visits with the Children during the three years of foster placement, Ms. Williams reported that he was completely reliant upon Mother "to meet the needs of the Children," and consistently declined to take an active role in providing childcare. *Id*. at 64.

Moreover, Ms. Williams testified that Father's parental apathy has remained constant and unwavering during these proceedings:

[COUNSEL]:  All right.  And you've attempted to engage [F]ather consistently over the past almost four years, correct?

MS. WILLIAMS:  Correct.

[COUNSEL]:  And has his involvement ever increased throughout the life of the case, in terms of participating in the [C]hildren's medical or educational needs?

MS. WILLIAMS:  It has not.

[COUNSEL]:  And I believe you stated this already, but he's never attended any of the [Children's] medical appointments?

MS. WILLIAMS:  No, he has not.

[COUNSEL]:  And he has not been engaged with their school at all?

MS. WILLIAMS:  He has not.

. . . .

[COUNSEL]:  And he's aware that compliance with those [SCP] objectives is the barrier to reunification?

MS. WILLIAMS:  Yes.

[COUNSEL]:  And, despite all of that awareness, his engagement has not improved at any time?

MS. WILLIAMS:  Correct.

N.T., 12/6/22, at 65-66.  Father also declined to meet with a parent mentor suggested by Ms. Williams after he claimed that such an obligation would conflict with his job.  *Id*. at 49.  Indeed, Father's ongoing refusal to take the steps necessary to be an active participant in the Children's lives was even

demonstrated at the termination hearing, itself, wherein Father texted his attorney after the hearing had already begun to inform the court that he could not attend due to work obligations. *Id*. at 8.

Based upon the foregoing, we find no basis upon which to conclude that the trial court abused its discretion or committed an error of law. To the contrary, the trial court's findings are fully supported by the certified record. Specifically, the unchallenged testimony of Ms. Williams indicates that Father has consistently refused to take an active role in the Children's education, healthcare, or general welfare. *Id*. at 65-66. This is particularly troubling since the record reflects that both W.O. and W.A.O. require regular, specialized medical care. Specifically, W.O. is in the regular care of an ophthalmologist and a pulmonologist. *Id*. at 49. W.A.O. sees similar physicians, and also receives additional care from a neurologist, a gastroenterologist, and an endocrine specialist. *Id*.

Thus, our review confirms that: (1) Father's ongoing incapacity is grounded in his refusal to take an active role in providing medical and educational support for the Children; (2) that refusal has caused the Children to be without essential parental care; and (3) Father's refusal cannot or will not be remedied. *See* 23 Pa.C.S. § 2511(a)(2). No relief is due.

Having found sufficient grounds for termination pursuant to Section 2511(a), we now turn to Father's arguments pursuant to Section 2511(b). On this point, Father claims that "the evidence presented by [DHS] did not rise

to the level of clear and convincing evidence as required by the applicable case law." Father's Brief at 24. Specifically, Father contends that the record reflects that he "called the resource parents to visit the [C]hildren" and also "asked the resource parent[s] to have the [C]hildren call him." *Id*. We discern that he is arguing that the trial court did not give sufficient weight to these efforts to maintain contact with the Children. Respectfully, we find that Father's narrow argument largely fails to encompass the many potential aspects of a complete Section 2511(b) analysis.

The trial court found that termination of Father's parental rights would serve the developmental, physical, and emotional needs and welfare of the Children. *See* Trial Court Opinion, 3/17/23, at 17. With respect to the required bond analysis, the trial court concluded that the Children shared a parental bond solely with their foster parents, as opposed to with Mother or Father. *Id*. at 15-17. Thus, the trial court concluded that terminating Father's parental rights would not cause irreparable harm to the Children. *Id*. On this point, the trial court largely credited the testimony and credibility of both Ms. Williams and Ms. Paller. *Id*. at 16 ("The testimon[ies] of the CUA representative and the child advocate social worker were deemed credible and afforded great weight.").

First and foremost, we note that Father has presented no affirmative evidence or salient argument averring that he shares a parental bond with the Children. To the contrary, the testimony of Ms. Williams reported that the

only parental bond that she had observed existed between Children and their foster parents. N.T., 12/6/22, at 52-54, 66-69. Ms. Paller similarly testified that any bond the Children may have with Father was not positive, stable, or beneficial. *Id*. at 15 ("There's no stability in regards to bond with [Mother or Father] because they often fail to attend visitation, educational meetings, doctor's appointments, or any form of contact, including letters or cards.").

It is well-established under Pennsylvania law that "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Instantly, there is no evidence speaking to a parental bond between Father and the Children. N.T., 12/6/22, at 52-53. Thus, we find no basis upon which to overturn the trial court's bond analysis.

Furthermore, the testimony of both Ms. Williams and Ms. Paller uniformly indicates that the Children's developmental, physical, and emotional needs and welfare will be better served by terminating Father's parental rights. Specifically, Ms. Williams attested that the Children have a strong, parental bond with their shared foster parents. *See id.* at 66-69, 53-54. Although X.R. is too young to express a settled preference, both W.A.O. and W.O. have repeatedly shared their wish to be adopted. *Id*. at 12-13, 66-69. This testimony also indicates that the Children collectively think of their foster parents as their "actual" parents, referring to them as "mama" and "papa." *Id*. Indeed, the foster home is the only home X.R. has ever known. *Id*. at

16-17. Furthermore, the testimony of both Ms. Paller and Ms. Williams confirmed that foster parents appropriately attend to the Children's day-to-day, educational and medical needs. *Id*. at 14-16, 53.

Based upon the foregoing review, we observe no abuse of discretion or error of law in the trial court's analysis. Accordingly, Father's second issue affords no basis for relief.

Finally, we turn to Father's challenge to the trial court's goal change orders with respect to the Children. *See* Father's Brief at 24-25. Instantly, our decision to affirm the trial court's termination decree necessarily renders moot any challenge to the goal change orders. *See In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa. Super. 2021); *Interest of D.R.-W.*, 227 A.3d 905, 917 (Pa. Super. 2020); *see also In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect."). Accordingly, we dismiss those appeals as moot.

In summary, we hold that the trial court did not abuse its discretion or commit an error of law in terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) and (b). Separately and as noted above, the appeals Father filed as to the goal change orders are moot.

Decrees affirmed. Appeals as to permanency goal change orders dismissed as moot.

Judge Kunselman joins the memorandum.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/31/2023